## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES OF AMERICA |
| U.S. Department of Justice |
| Antitrust Division |
| 450 Fifth Street, N.W., Suite 4100 |
| Washington, DC 20530 |
| |
| *Plaintiff,* |
| |
| v. |
| |
| AON plc |
| Aon Center |
| 200 E. Randolph Street |
| Chicago, IL 60601 |
| |
| and |
| |
| WILLIS TOWERS WATSON plc |
| 800 N. Glebe Road |
| Suite 1000 |
| Arlington, VA 22203 |
| |
| *Defendants.* |

## COMPLAINT

The United States of America, acting under the authority of the Attorney General of the United States, brings this civil antitrust action to prevent Aon plc ("Aon") from acquiring Willis Towers Watson plc ("WTW") in violation of the antitrust laws.

## I. INTRODUCTION

1.      Aon's proposed acquisition of WTW would combine two of the three largest insurance brokers in the world. It would eliminate substantial head-to-head competition and likely lead to higher prices and less innovation, harming American businesses and their customers, employees, and retirees.

1

2.     American businesses—from steel manufacturers to banks, from hospital systems to technology companies—face significant challenges as they work to provide the products and services consumers use every day. They must prepare for and manage complex and evolving risks, including physical damage to their plants and warehouses, injuries to bystanders from their operations, and significant financial errors by their executives. Businesses also face the challenge of providing attractive and cost-effective health and retirement benefits to their employees and retirees, millions of whom rely on these benefits as part of their healthcare and retirement plans. To address these issues, businesses rely on insurance brokers like Aon and WTW.

3.     American businesses pay billions of dollars a year to insurance brokers for their services, and depend on competition among brokers to deliver these services at high quality and low cost. These services include identifying and analyzing risks, consulting on risk and benefits strategies, and executing those strategies through procurement of insurance and other means of risk mitigation. Businesses seek competitive bids from insurance brokers when deciding how to manage their risks and provide for their employees' and retirees' health benefits and pensions. Competition among insurance brokers such as Aon and WTW ensures that businesses obtain innovative, high-quality broking services to manage their risks, as well as the assistance they need to provide their employees and retirees with attractive health and retirement benefits. It is not practical or economically feasible for most businesses to manage these specialized services themselves.

4.     Aon and WTW are the second- and third-largest insurance brokers in the world. Together, Aon, WTW, and Marsh McLennan ("Marsh") tower above other firms—so much so that they are often referred to as the "Big Three." The Big Three dominate competition for insurance broking for the largest companies in the United States, almost all of which are

customers of at least one of them. The Big Three compete with each other directly on price, service, and the development of innovative solutions to the challenges these customers face. Other broking firms do not offer large customers the same quality and combination of services that the Big Three currently deliver: extensive global networks of offices, sophisticated data and analytics, a breadth of knowledge across multiple types of employee benefits and risk management strategies, strong reputations, and depth of personnel with specialized expertise. With respect to these qualities, the Big Three distinguish themselves from other firms.

5.     The 2016 merger of Willis Group and Towers Watson created WTW and vaulted it into the Big Three. Aon immediately recognized the threat of a broker able to match Marsh and Aon in capabilities and scale. In response to the announcement of the merger, Aon management told its Board of Directors in September 2015 that the combination of Willis and Towers Watson would create "a third major player in the space for the first time." Customers have benefitted from head-to-head competition between Aon and WTW in the form of lower prices, higher quality services, and increased innovation.

6.     Now, by combining with WTW, Aon would eliminate this competition and remake the Big Three into a Big Two. As Aon's Chief Broking Officer explained to his colleagues:

> "[w]e have more leverage than we think we do and will have even more when [the] Willis deal is closed . . . we operate in an oligopoly which not everyone understands."

If allowed to merge with WTW, Aon likely would use that leverage against American businesses. Businesses likely would pay the price in the form of higher fees for lower-quality services for the management of their most complex and expensive commercial risks through insurance and reinsurance. They likely would pay the price through higher costs for lower-

quality service for the management of health benefits plans of millions of employees and retirees. And they likely would pay the price through higher costs for lower-quality service for the administration of trillions of dollars in defined benefit pension plans on behalf of their retirees. Ultimately, the burden of those higher costs is likely to fall on their customers, employees, and retirees across the country.

7.     For these reasons and those set forth in this Complaint, Aon's proposed acquisition of WTW is likely to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.     THE DEFENDANTS AND THEIR UNLAWFUL PROPOSED MERGER

8.     Aon plc is a "leading global professional services firm" providing broking and advisory services. Aon is incorporated in Ireland and headquartered in London. It has approximately 50,000 employees and offices in more than 100 countries, including over 100 offices in the United States. In 2020, Aon reported revenues of more than $11 billion.

9.     Willis Towers Watson plc is a "leading global advisory, broking and solutions company," also incorporated in Ireland and headquartered in London. It has approximately 45,000 employees and offices in more than 90 countries, including over 80 offices in the United States. In 2020, WTW reported revenues of more than $9 billion.

10.     On March 9, 2020, less than five years after Aon identified WTW as a "third major player," Aon agreed to acquire WTW in an all-stock merger agreement valued at approximately $30 billion (the "Merger").

## III.     THE MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION IN FIVE RELEVANT MARKETS

11.     Aon and WTW compete with each other across virtually all of their respective offerings. In each of the following five relevant product markets in the United States, the effects

of the proposed Merger would be particularly acute and the proposed Merger would be likely to substantially lessen competition: (1) property, casualty, and financial risk broking for large customers; (2) health benefits broking for large customers; (3) actuarial services for large single-employer defined benefit pension plans; (4) the operation of private multicarrier retiree exchanges; and (5) reinsurance broking.

### A.   THE MERGER IS PRESUMPTIVELY UNLAWFUL IN EACH RELEVANT MARKET

#### 1.   *Each of the five products at issue is a relevant antitrust market.*

12.     A typical starting point for merger analysis is defining a relevant market, which has both a product and a geographic dimension. Courts define relevant product markets to help determine the areas of competition most likely to be affected by a merger. Each of the five products identified in Paragraph 11 constitutes a line of commerce as that term is used in Section 7 of the Clayton Act, 15 U.S.C. § 18, and each is a relevant product market in which competitive effects can be assessed. As described in more detail below, each satisfies the well-accepted "hypothetical monopolist" test. This test, as set forth in the U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* (the "Guidelines"), asks whether a hypothetical monopolist would profitably impose a price increase—specifically, a small but significant and non-transitory increase in price ("SSNIP") on at least one product sold by the merging firms in the relevant market. In addition, and as described in more detail below, each of the five products is recognized in the industry and by the Defendants as a separate business line, has unique characteristics and uses, and has unique customers that specifically rely on these products and services.

13.     It is appropriate to define relevant product markets around sales made to certain types of customers, such as large customers. The insurance broking industry displays both of the

characteristics identified in the Guidelines for when markets may be defined by customer types: prices are individually negotiated and suppliers (such as Aon and WTW) have information that would allow them to identify customers that have fewer competitive options. Large customers have distinct needs and preferences, and brokers offer customized services that are tailored to, priced for, and individually negotiated with each customer. As discussed below, in many of these markets, Aon and WTW segment their customers based on observable characteristics, such as their size, as part of the ordinary course of their business. Additionally, given the customer-specific nature of the broking services offered by Aon and WTW, those services cannot be purchased from or re-sold by one customer to another (or "arbitraged").

14.     The United States is a relevant geographic market for each of the five products at issue. This geographic market is based on the locations of customers and therefore includes all sales made to customers in the United States, regardless of the supplier's location. Because brokers know their customers' locations, a hypothetical monopolist could target customers on the basis of geography. For reasons set forth below, a SSNIP imposed by a hypothetical monopolist over customers in the United States would not be defeated by substitution away from the product or by arbitrage.

### 2.     The Merger would eliminate important competition in the relevant markets and would create a presumption of harm.

15.     The proposed Merger would eliminate important competition in markets that are already highly concentrated. The more that a proposed merger would increase concentration in a market, the more likely it is that the proposed merger would substantially lessen competition. Mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively unlawful. To measure market concentration levels, courts often use the Herfindahl-Hirschman Index ("HHI"). HHIs range

from 0 in markets with no concentration to 10,000 in markets where one firm has a 100% market share. If the post-transaction HHI would be more than 2,500 and the change in HHI as a result of the merger would be more than 200, the market is highly concentrated and the transaction is presumed likely to enhance market power and substantially lessen competition.

16.    Defendants' combined market share exceeds 40% in each of the five relevant markets described in this Complaint. Should the proposed Merger be allowed to proceed, the concentration level and the increase in concentration would exceed the HHI thresholds in each of the five relevant markets. The proposed Merger thus presumptively violates Section 7 of the Clayton Act.

17.    Market realities confirm what is indicated by the Defendants' high market shares. High levels of concentration exist because customers view Aon and WTW—along with Marsh— as offering key advantages over other firms. First, through a mix of broad data, deep experience, knowledge, and institutional resources that outstrip smaller insurance brokers, Aon and WTW can customize their products to fit a particular client's unique needs. Second, Aon and WTW offer, and have deep talent across, the full range of commercial risk and employee benefits products and services, allowing them to provide advice and insights that would not be possible for a smaller firm with a narrower scope. Third, Aon and WTW have extensive global networks of offices that facilitate the provision of seamless worldwide service for multinational customers. Finally, as crucial sources of business for insurance carriers, Aon and WTW are able to secure carriers' attention on behalf of their customers more easily and promptly than could any individual customer (or smaller insurance broker). As Aon summarized in a 2019 Board of Directors presentation: "Aon possesses a depth and breadth of data assets, customer relationships, and industry expertise that are not easily replicable, establishing a near-term

competitive advantage." After the proposed Merger, only Marsh would stand capable of matching these advantages.

18.     The proposed Merger would substantially lessen competition in the relevant markets as a whole, despite the fact that some customers can and do use other brokers. There may be customers for whom a broker besides Aon or WTW—whether Marsh or a smaller firm—would be an acceptable alternative, or even a good alternative, to the lost option of an independent Aon or WTW. But the existence of such customers does not protect the many customers that have benefitted from competition between Aon and WTW and would continue to benefit from that competition absent the proposed Merger. Those customers—and the relevant markets as a whole—would face a substantial lessening of competition if the proposed Merger were allowed. That some customers *could* turn to other alternatives does not mean that a significant number of customers *would* do so, nor does it mean that a substantial lessening of competition would not be likely. Indeed, in connection with a recent Request for Proposal ("RFP") for a large customer, a WTW executive observed, "[g]iven [the client's] global footprint and the complexity of their risk transfer programs, only WTW, Marsh, and Aon were considered" as potential options. Customers like these would lose the significant benefits of head-to-head competition between Aon and WTW.

### B.     CLAYTON ACT VIOLATION #1: PROPERTY, CASUALTY, AND FINANCIAL RISK BROKING FOR LARGE CUSTOMERS

19.     Commercial risk broking for large customers is at the heart of the Defendants' businesses. Aon and WTW's broking services include identifying, managing, and analyzing risks for their customers and obtaining insurance coverage for those risks. Among large customers in the United States, Aon and WTW have a combined market share of at least 40% for broking property damage risk, third-party liability (or "casualty") risk, and financial risk, which together

account for the majority of most large customers' commercial risk insurance expenditures. As WTW observed in a 2019 strategy presentation, "Marsh and Aon dominate the large account space" and, along with Marsh and Aon, WTW is "one of the only brokers positioned to serve and win in [the] large account space." The proposed Merger would substantially lessen competition by eliminating "one of the only brokers" capable of serving large customers' commercial risk insurance needs.

### 1. Property, casualty, and financial risk broking for large customers in the United States is a relevant market.

20.     In the course of producing the goods and services that enable and enhance everyday life, businesses face significant risks, including damage to their property, liability arising from their operations, and injuries to their employees. The cost of these risks is borne not just by the businesses themselves, but by consumers and the economy at large.

21.     Insurance brokers such as Aon and WTW assist their customers in identifying, managing, and insuring against these risks in several ways. First, brokers help identify the risks the customer faces and devise methods to mitigate those risks. For example, executives rely on brokers to advise on which risks to insure through external insurers and which to manage through alternative methods. Second, brokers use data and analytics to help customers determine how much insurance to buy and how to best distribute it among different insurance carriers. Third, brokers negotiate with insurers to obtain insurance coverage for their customers. Fourth, brokers often assist with their customers' claims, helping to ensure that claims are paid promptly and efficiently. It is not practical or economically feasible for most large customers to purchase commercial risk insurance directly from insurance carriers.

22.     There are three core categories or "lines" of risk that virtually all large customers must manage: (1) property risks arising from damage to physical property, such as a factory,

warehouse, or piece of machinery; (2) casualty—sometimes called "liability"—risks related to claims arising from the customer's activities; and (3) financial lines, or risks related to the conduct of the customer's employees, including directors' and officers' liability. Customers purchase broking services through RFPs or other individualized negotiations. The customer's needs are transparent to the broker, allowing the broker to target its offering and pricing to that particular customer. Customers typically either bid out each risk (property, casualty, and financial) separately, or they award each risk separately despite organizing them into a consolidated RFP.

23.     Insurance broking for each of the property, casualty, and financial risks of large customers are separate relevant product markets. The relevant geographic market is the United States. The markets for insurance broking for property, casualty, and financial risks for large customers in the United States satisfy the hypothetical monopolist test set forth in the Guidelines. A hypothetical monopolist in these markets likely would impose a SSNIP without losing sales sufficient to make that price increase unprofitable. In the face of a SSNIP, large customers would continue to require broking services to manage their commercial risks. And they would not be able to avoid a price increase by procuring commercial risk insurance on their own.

24.     Property, casualty, and financial lines each represent insurance coverage of a specific risk that is not a substitute for coverage of a different risk. Thus, broking for each risk constitutes its own relevant product market. Because broking for property, casualty, and financial lines are offered to large customers under similar competitive conditions, however, the likely effects can be analyzed in the aggregate. In this Complaint, they are referred to collectively as the market for property, casualty, and financial risk broking for large customers in the United States.

25.    The Defendants' business practices are consistent with and reflect a market for property, casualty, and financial risk broking for large customers in the United States. Defendants, and the industry as a whole, use several different metrics in the ordinary course to identify which of their customers or potential customers should be considered "large." A common metric used is annual revenue. Both Defendants, as well as their competitors, have used or considered using the Fortune 1000—the 1,000 largest companies in the United States by annual revenue—as a proxy for large customers. Accordingly, consistent with the thresholds that the Defendants consider in the ordinary course of business, large customers for purposes of property, casualty, and financial risk broking include at least the firms in the Fortune 1000.

26.    Both Defendants recognize that large customers—as compared to mid-market and small customers—are distinct purchasers of commercial risk insurance broking with unique characteristics. Both Aon and WTW employ executives singularly dedicated to selling to and serving their "large account segments." Defendants and other brokers treat large customers differently than middle market customers.

27.    Large customers typically need more services and a greater depth and breadth of experience than do customers with fewer, simpler risks. As a May 2018 presentation to WTW's CEO explains: "Clients above $1B[illion in revenue are] assumed to have complex requirements and require a different approach." For example:

- Large customers typically have a more sophisticated risk management strategy and buying style, including dedicated risk managers responsible for the purchase of insurance. Large customers therefore require a distinct sales approach that is more technical and addressed to a more sophisticated audience.

11

- Large customers rely more heavily on data and analytics to better understand the total cost of their risk. These tools are uniquely valuable to large customers because, as one WTW executive testified, "[f]or data and analytics to be a useful tool, you need some complexity and size of your risk portfolio for it to be statistically meaningful."

- Large customers typically demand consistent global service. As a 2018 presentation to WTW's Board of Directors explained, a "[g]lobal footprint" is "non-negotiable for multinationals," many of whom "prefer an owned network: consistency of service, lower chance of responsibilities dropped between teams."

- Large customers are often sensitive to a firm's reputation and seek brokers with a track record of strong delivery when handling comparably demanding accounts. As WTW's head of large accounts testified, broking for large customers is a business of "credentialing and credibility."

As a 2018 presentation delivered by WTW's "large accounts leader" explains, "Large & complex clients have a different set of needs and expectations than M[iddle] M[arket] clients," and describes "analytics," "Global Strength," and a "[d]eep bench of client-facing talent" as "Table Stakes" for "Large Account Practice Success."

   **2.      The Merger is likely to substantially lessen competition for property, casualty, and financial risk broking for large customers in the United States.**

28.      The market for property, casualty, and financial risk broking for large customers in the United States is already highly concentrated and would be even more concentrated after the proposed Merger. Aon and WTW's combined market share of property, casualty, and financial risk broking for large customers in the United States would be at least 40%, and Marsh

is the only other competitor with substantial share. If the proposed Merger were allowed to proceed, the post-Merger concentration and increase in concentration would exceed the HHI thresholds identified in Paragraph 15 above. The proposed Merger is therefore presumptively unlawful.

29.     Competition between Aon and WTW in property, casualty, and financial risk broking for large customers in the United States leads to significant benefits for those customers. The presence of Aon and WTW as competitors forces each to offer lower prices and higher quality services than it otherwise would. Competition between Aon and WTW has led each to offer discounted pricing or to waive fees in order to win or retain business. As an example, a WTW sales executive emailed senior WTW leadership in March 2020 to report that "as of today, we are officially the broker to [a large customer] for all lines globally" following a nine-month RFP process, explaining in a later reply that "the final two were WTW and Aon." Along the way, Aon cut its fee by nearly half in an effort to prevail—but ultimately WTW won because it was "lower on fees." If the proposed Merger were allowed, customers would lose this ability to leverage Aon and WTW against each other, likely resulting in higher prices and decreased service levels.

### C.     CLAYTON ACT VIOLATION #2: HEALTH BENEFITS BROKING FOR LARGE CUSTOMERS

30.     Large employers seek to offer attractive and cost-effective health benefits to their employees, which can include medical insurance, pharmacy plans, dental and vision insurance, and other benefits. Aon and WTW help large employers design and implement these complex health benefits plans. The Big Three—in contrast to smaller brokers—offer unparalleled capabilities to help design and implement these intricate plans. These capabilities include industry expertise, global networks, and large-scale data and analytics derived from their already

large customer base, such as the ability to analyze employee data from other large employers in the same industry. In the market for health benefits broking for large customers in the United States, Aon and WTW have a combined market share of at least 40%.

31.     The Big Three are particularly differentiated by the substantial amounts of proprietary data, as well as the infrastructure needed to manage that data, that they can bring to bear to structure health benefits plans for large employers. These are not resources that smaller firms could easily or quickly acquire. As a 2020 WTW survey of its health benefits sales force noted, the Big Three have a "breadth and depth" of expertise and resources that "smaller firms and brokers cannot match." In addition, large employers value the extensive network of owned global office locations that the Big Three offer and smaller players cannot easily replicate. The proposed Merger would eliminate competition between Aon and WTW for health benefits broking for large customers, and leave these customers with few meaningful alternatives.

### 1.     Health benefits broking for large customers in the United States is a relevant market.

32.     Tens of millions of Americans receive health insurance and benefits through their employer. In providing health benefits to their employees, employers develop complicated health plans that cover a variety of benefits and involve significant cost and resources.

33.     Employers rely on brokers such as Aon and WTW to help design and implement those health benefits plans. Aon and WTW select plan providers and place insurance plans with those providers, manage the relationship with those providers, design the plan (e.g., pick plan features such as amount of deductible and which benefits are covered), calculate expected costs of the plan for both the employer and employee, and provide analytics to track the performance of the plans. These services thus include not only facilitating the employers' purchases of

policies but also providing tailored consultation and advice based on each employer's specific needs. Companies purchase these services through RFPs or other individualized negotiations.

34.     Health benefits broking for large customers is a relevant product market. The relevant geographic market is the United States. A hypothetical monopolist of health benefits broking for large customers in the United States likely would profitably impose a SSNIP. Large customers are unlikely to self-supply the health benefits broking services that they purchase from brokers today. Individual employers lack access to cross-industry and cross-insurer data on key metrics, such as provider network discounts, and bringing the broking functions in-house would involve substantial time and expense. Similarly, buying insurance directly from insurers is not an adequate substitute for large customers because health benefits brokers provide many services that insurers do not. Insurers have an inherent conflict created by their interest in selling their own products, and no individual insurer can bring insights from cross-insurer data to bear for large customers.

35.     Defendants' business practices are consistent with and reflect a market for health benefits broking for large customers in the United States. In the ordinary course of business, both Aon and WTW recognize that large customers have distinct characteristics and needs and offer sales, marketing, and servicing approaches specifically aimed at meeting large customers' needs. Both Defendants segment health benefits customers by size in the ordinary course of business, usually based on the number of employees. Both Defendants consider "large" customers as those with 5,000 or more employees and cater specifically to those large customers in the ordinary course of business. Accordingly, consistent with Defendants' ordinary course of business, large customers for purposes of health benefits broking include those firms with 5,000 or more employees.

36.     Large customers typically have distinct needs and preferences for health benefits broking, as compared to smaller customers. For example:

- Large customers seek to compare their health benefits programs to those of similarly situated employers to ensure they offer a health benefits package that will attract and retain employees. These comparisons require granular data from a book of business comprising a significant number of other large employers, which only brokers with the scale of Aon and WTW possess.

- By virtue of their size, large employers often have sophisticated needs and require customized solutions. For example, a customer with a large employee population seeking to manage the treatment and costs for its employees with a specific health condition may enlist a broker to provide a tailored offering specific to those employees.

- Large employers are often multinational companies and may seek to coordinate their health benefits offerings around the world.

> ### 2.     The Merger is likely to substantially lessen competition for health benefits broking for large customers in the United States.

37.     The market for health benefits broking for large customers in the United States is already highly concentrated and would be even more concentrated after the proposed Merger. Aon and WTW's combined market share would be at least 40%, and Marsh is the only other competitor with substantial share. The post-Merger concentration and change in concentration would exceed the HHI thresholds identified in Paragraph 15 above. The proposed Merger is thus presumptively unlawful.

38.     Aon and WTW, along with Marsh, are in a class of their own in providing health benefits broking to large customers. A 2017 Aon assessment of the health benefits market in the

United States concluded that "Marsh and Willis continue to be two primary competitors in core large market space." WTW's perception is the same: an August 2018 memo to WTW's CEO identified Aon and Marsh as WTW's two "primary competitors" in health benefits. Competition between Aon and WTW has led to lower prices and innovative solutions for health benefits broking customers. For example, in 2020, Aon retained a health benefits broking client's U.S. business only after a "neck to neck battle" with WTW in which it "agreed to match all of [WTW's] fees." In addition, Aon has made investments in partnerships to develop innovative new products and services in order "to gain equal footing with WTW." The proposed Merger would eliminate that competition between Aon and WTW and leave many large customers with only Marsh remaining as a meaningful competitor.

### D.    CLAYTON ACT VIOLATION #3: ACTUARIAL SERVICES FOR LARGE SINGLE-EMPLOYER DEFINED BENEFIT PENSION PLANS

39.    There are roughly 20,000 single-employer defined benefit pension plans in the United States today, which invest and manage $2.5 trillion in retirement assets on behalf of more than 20 million Americans. Actuaries help ensure that these pension plans meet obligations to pensioners and assist pension plans with required reporting to federal regulators. Aon and WTW are the two largest providers of actuarial services for large single-employer defined benefit pension plans in the United States, with a combined market share of at least 60% of all assets held by such plans. The proposed Merger would eliminate competition between Aon and WTW and leave these plans with few competitive options.

#### 1.    *Actuarial services for large single-employer defined benefit pension plans in the United States is a relevant market.*

40.    Single-employer defined benefit pension plans are maintained by private companies for their employees and retirees. Companies that maintain single-employer defined benefit pension plans need to ensure that their plans are adequately designed, well-funded, and in

17

compliance with regulatory requirements. Actuaries, in turn, ensure that companies are taking the steps necessary to fulfill their promises to retirees, thereby protecting the stream of income depended upon by retirees across the country.

41. These companies require actuarial firms such as Aon and WTW to calculate the costs and liabilities of the plans, defend the assumptions and methods used, and report details to the government and the public as required by law. In addition, actuaries calculate the premiums that a pension plan owes to the Pension Benefit Guaranty Corporation and actuaries consult on plan design, plan terminations, and corporate mergers and acquisitions involving defined benefit plans. Companies purchase these services through RFPs or other individualized negotiations. The assets under management and the particular needs for that plan are transparent to brokers.

42. As single-employer defined benefit pension plans increase in size, their actuarial needs tend to become more complicated. Reflecting these needs, large companies tend to hire actuarial firms that can provide customized tools and specialized services, such as industry benchmarking, specialists in mergers and acquisitions, and specialized teams related to pension risk transfer and plan termination. Although there is no universal definition of "large" single-employer defined benefit pension plans, in the ordinary course of business both Aon and WTW use $250 million of assets under management as a relevant point of segmentation for large, single-employer defined benefit pension plans. Accordingly, consistent with Defendants' ordinary course of business, large single-employer defined benefit pension plans include plans with at least $250 million in assets under management.

43. Actuarial services for large single-employer defined benefit pension plans is a relevant product market. The relevant geographic market is the United States. A hypothetical monopolist of actuarial services for large single-employer defined benefit pension plans in the

United States likely would profitably impose a SSNIP. Companies that offer large single-employer defined benefit pension plans would not substitute to actuarial services for other types of defined benefit pension plans such as multi-employer or public-sector pensions, as the services offered to those plans are governed by separate regulatory schemes and insurance programs. Moreover, the firms that specialize in multi-employer and public-sector actuarial work do not have the deep expertise and customized tools needed to serve large, single-employer defined benefit pension plans. Nor would most companies with large single-employer defined benefit pension plans supply actuarial services themselves. Accordingly, actuarial services for large single-employer defined benefit pension plans in the United States is a relevant market.

44.     Defendants' business practices are consistent with and reflect a market for actuarial services for large single-employer defined benefit pension plans. Both Aon and WTW's ordinary course documents discuss single-employer defined benefit pension plans separately from other types of pension services, and calculate market shares for solely these types of plans. Additionally, both Aon and WTW have distinct employees that focus on the single-employer defined benefit pension plan actuarial business, and other actuarial firms specialize in only multi-employer or public-sector pension plan actuarial services.

> **2.     The Merger is likely to substantially lessen competition for actuarial services for large single-employer defined benefit pension plans in the United States.**

45.     The market for actuarial services for large single-employer defined benefit pension plans in the United States is already highly concentrated and would be even more concentrated after the proposed Merger. Aon and WTW's combined market share in actuarial services for single-employer defined benefit pension plans in the United States with more than $250 million in assets under management would be at least 60%, and Marsh is the only other competitor with substantial share. The post-Merger concentration and change in concentration

would exceed the HHI thresholds identified in Paragraph 15 above. The proposed Merger is thus presumptively unlawful.

46.     Aon and WTW are the two most attractive options for many large single-employer defined benefit pension plans and compete directly on price and innovation. That competition has led to, as one Aon document put it, "isolated pockets of extremely aggressive pricing" to the advantage of pension plan customers and ultimately their pensioners. That competition would be lost as a result of the proposed Merger. The proposed Merger is also likely to reduce innovation and customer service levels as the merged firm will have less reason to fear losing business as a consequence of poor service. As Aon employees recently recognized when discussing a particular RFP just after the announcement of the proposed Merger, the prospective customer had "less leverage now due to the recent announcement," because "our main/only competitor for retirement consulting is WTW."

### E.     CLAYTON ACT VIOLATION #4: PRIVATE MULTICARRIER RETIREE EXCHANGES

47.     Aon and WTW are the only two major operators of private multicarrier retiree exchanges in the United States—marketplaces through which employers and unions offer Medicare health and prescription drug insurance plans from a variety of health insurance carriers to their retirees. Together, Aon and WTW account for at least 95% of all retirees purchasing Medicare plans through private multicarrier retiree exchanges in the United States. As an Aon executive put it in a March 2020 email, this market is "a two horse race" between Aon and WTW. The proposed Merger would remove the only competitive alternative to Aon, with no near-term prospects to replace that alternative. If allowed to proceed, the proposed Merger would create a monopoly.

### 1.    The operation of private multicarrier retiree exchanges in the United States is a relevant market.

48.    Offering health benefits to retirees is an expensive proposition for employers and unions in the United States, and these entities generally seek to provide more cost-effective health insurance to their Medicare-eligible retirees. Indeed, their ability to provide more cost-effective health insurance can be a determinative factor in whether some employers and unions continue to offer this benefit to retirees at all. To better manage their retiree health insurance programs, many employers and unions have transitioned away from traditional group retiree health plans to private multicarrier retiree exchanges.

49.    In these arrangements, an exchange operator such as Aon or WTW assembles a range of Medicare health plans from which retirees can choose. These Medicare health plans are then funded or partially funded by contributions from the employer or union to a Health Reimbursement Arrangement (or "HRA"). Exchange operators provide dedicated call center staff to assist retirees in choosing the right plans, and these operators also manage the entity's funding of HRAs as well as the payment of health plan premiums out of the HRAs. Employers and unions select exchange operators through RFPs or other individualized negotiations. As part of that process, exchange operators can structure their offerings to a particular client opportunity.

50.    Other types of retiree health coverage are not reasonable substitutes for private multicarrier retiree exchanges and are therefore not part of the relevant market. Employers and unions that do not use a private multicarrier retiree exchange for their retirees typically provide coverage either through self-funded group health plans or group Medicare Advantage plans. Group plans generally involve more unpredictable employer contributions at greater cost to employers. By contrast, a private multicarrier retiree exchange leaves the employer or union responsible only for a fixed contribution to each retiree's cost of coverage. Employers and

unions that move to a private exchange rarely switch back to a group plan. The one-way nature of switching stems in part from the key advantages that private exchanges offer over group plans: employers and unions can devote fewer personnel to administering retiree health coverage because the exchange handles all the administration of enrolling retirees in health plans and disbursing their HRA funds, and employers and unions know that their only retiree healthcare costs will be the amount they commit to fund an HRA.

51.     Other options are also not reasonably interchangeable with a private multicarrier retiree exchange. A "single carrier" exchange operated by an insurance carrier that features only that carrier offers a much more limited set of choices for retirees than multicarrier exchanges. As Aon explained in an April 2020 client presentation: "Multicarrier exchanges will provide more value due to the choice and diversification opportunities, relative to single-carrier exchanges." Providers of direct-to-consumer retiree solutions are also not a reasonable substitute for private multicarrier retiree exchanges. Direct-to-consumer providers do not typically contract with Aon and WTW's customers—the retirees' former employers or unions—and do not offer the high-touch customer service that Aon and WTW deliver as part of their private multicarrier retiree exchanges and that retirees (and their former employers and unions) value.

52.     The operation of private multicarrier retiree exchanges is a relevant product market. The relevant geographic market is the United States. A hypothetical monopolist of private multicarrier retiree exchanges in the United States likely would profitably impose a SSNIP. An insufficient number of employers and unions would switch away from private multicarrier retiree exchanges to group plans, single-carrier exchanges, or direct-to-consumer providers to make a SSNIP unprofitable. Accordingly, the hypothetical monopolist test is

satisfied, and the operation of private multicarrier retiree exchanges in the United States is a relevant market.

53.     Defendants' business practices are consistent with and reflect a market for private multicarrier retiree exchanges in the United States. Both Aon and WTW have distinct divisions that focus on the retiree exchange business, with employees who are exclusively responsible for that business. Aon and WTW each market their private multicarrier retiree exchanges as distinct products, and they advertise the exchanges' particular strengths and advantages over other kinds of retiree health benefits.

### 2. *The Merger is likely to substantially lessen competition for the operation of private multicarrier retiree exchanges in the United States.*

54.     Today, Aon and WTW represent at least 95% of the market for private multicarrier retiree exchanges in the United States. The proposed Merger would essentially transform private multicarrier retiree exchanges from a duopoly into a monopoly. The post-Merger concentration and the increase in concentration would exceed the HHI thresholds identified in Paragraph 15 above. The proposed Merger is thus presumptively unlawful.

55.     Aon and WTW compete on both price and service. As WTW's National Leader for Client Relationships and Sales explained in connection with a 2019 RFP, WTW was forced to make a significant portion of its fees contingent on hitting service level targets in order to win the business because Aon was "the key competitor" offering the same product. Moreover, Aon has driven innovation in customer service offerings—for instance, offering a personalized benefits advisor for every customer, and improving its interactive offerings on its website—that WTW has tracked and sought to match. Without the competitive pressure that Aon and WTW exert on each other today, the merged firm would face little to no competition and be able to extract higher prices for the operation of private exchanges, reduce the quality of service, or both.

### F.    CLAYTON ACT VIOLATION #5: REINSURANCE BROKING

56.    Reinsurance is insurance for insurance carriers. Aon and WTW help insurance carriers transfer part of their underwriting risk to reinsurers or the capital markets so that those carriers can reduce their own exposure to losses, continue writing insurance policies, and continue serving their customers. For reinsurance broking for customers in the United States, Aon and WTW have a combined market share of at least 40%, with Marsh controlling most of the rest. The Big Three far surpass other reinsurance brokers in key attributes, such as: breadth and depth of experience; knowledge of the market; data and analytics capabilities that support the robust modeling required for reinsurance program design; and "clout" with reinsurers—the ability to command a reinsurer's attention, including for the prompt payment of claims. As stated in an April 2021 presentation by WTW reinsurance executives describing the reinsurance market, "[t]he Big 3 are defined by the advisory and transactional capabilities they offer clients on a global scale and deliver regionally." Because of these capabilities, the Big Three are the preferred options for the overwhelming majority of reinsurance customers.

57.    These market conditions led WTW executives to tell their Board of Directors in 2018 that the reinsurance broking market featured "global domination of 3 firms with analytics firepower." The proposed Merger would eliminate the benefits of competition between two of those three firms (Aon and WTW) and leave customers with even fewer options.

#### 1.    *Reinsurance broking for customers in the United States is a relevant market.*

58.    Just as other businesses purchase insurance to reduce their exposure to natural disasters, liability, crime, and other risks, insurance carriers transfer portions of their risk exposure either to (a) reinsurers or (b) investors through "alternative capital," in which risk is transferred through financial vehicles as opposed to traditional insurance policies. Without

reinsurance, the price of insurance likely would rise and the availability of insurance likely would fall, impacting the price and availability of goods and services across the economy.

59.     Aon and WTW provide reinsurance broking services to insurance carriers to help them handle these reinsurance needs. Reinsurance brokers provide value through their relationships with and knowledge of reinsurers around the world, including their specialties, capacities, and propensity for agreeing to particular contractual terms. Brokers also provide data analytics models, derived from thousands of past placements, that enable them to advise insurance carriers on how to structure their reinsurance programs. Data and analytics capabilities require sizeable investment: for example, Aon reported "[o]ver $130 [million] invested annually in analytical capabilities." Insurance carriers purchase reinsurance broking services through RFPs or other negotiated processes.

60.     Purchasing reinsurance directly from a reinsurer without a broker is not a close substitute for reinsurance broking. In fact, many reinsurers require the use of a broker and will not sell directly to insurance carriers at all. Moreover, insurance carriers generally have large and complex exposures that require relationships with multiple reinsurers to cede all the risk they want to transfer. Insurance carriers use a broker's expertise to structure their reinsurance programs, identify and shop their programs to the reinsurers that best meet their needs, and negotiate the details of a reinsurance contract with each reinsurer that may provide a portion of the coverage. Even in the instances where insurance carriers purchase some reinsurance directly, they generally continue to use a broker for the majority of their reinsurance needs. Reflecting the value that reinsurance brokers provide, brokers have handled an increasing share of reinsurance placements in recent years while direct placement has declined in the United States.

61.     Reinsurance broking for each type of underlying risk is a separate relevant product market. The relevant geographic market for reinsurance broking is the United States. A hypothetical monopolist of reinsurance broking for customers in the United States likely would impose a SSNIP because an insufficient number of customers would switch to alternatives (including self-supply, such as directly purchasing reinsurance without use of a broker) to make that price increase unprofitable.

62.     Reinsurance policies represent coverage of a specific underlying risk that is not a substitute for coverage of a different risk. Thus, reinsurance broking for each risk constitutes its own relevant product market. Because all reinsurance broking is offered under similar competitive conditions, however, the likely effects can be analyzed in the aggregate. In this Complaint, they are referred to collectively as the market for reinsurance broking for customers in the United States.

63.     Defendants' business practices are consistent with and reflect a market for reinsurance broking for customers in the United States. Each of Aon and WTW has individual business units dedicated to reinsurance broking. Aon's Reinsurance Solutions group is a distinct business unit within Aon focused on reinsurance broking. WTW's primary reinsurance unit, Willis Re, is also a distinct business unit within WTW focused on reinsurance broking.

### 2.     *The Merger is likely to substantially lessen competition for reinsurance broking for customers in the United States.*

64.     The market for reinsurance broking for customers in the United States is already highly concentrated and would be even more concentrated after the proposed Merger. Aon and WTW's combined market share would be at least 40%, and Marsh is the only other competitor with substantial share. The post-Merger concentration and the increase in concentration would

exceed the HHI thresholds identified above. The proposed Merger is thus presumptively unlawful.

65.     Insurance carriers benefit from the current competition between Aon and WTW. Aon and WTW have lowered their prices and increased the quality of their services offered to win (or retain) reinsurance clients when bidding in competition with each other. For example, in 2017, Aon cut its fees by 20% in order to retain a client in the face of potential competition from WTW. If allowed to proceed, the proposed Merger would eliminate this competition and lead to higher prices and reduced quality service for these customers.

### G.     THE MERGER SHOULD BE ENJOINED

66.     In each of the five relevant markets, the proposed Merger is likely to substantially lessen competition, resulting in higher prices, lower quality services, and less innovation. A substantial lessening of competition in any relevant market is a violation of Section 7 of the Clayton Act and is sufficient for the Court to enjoin the proposed Merger in its entirety.

### IV.   COUNTERVAILING FACTORS DO NOT OFFSET THE ANTICOMPETITIVE EFFECTS OF THE MERGER

67.     Entry, expansion, and repositioning would not be timely, likely, or sufficient to offset the anticompetitive effects of the proposed Merger in any relevant market. Reputation, knowledge, and experience are important competitive differentiators and barriers to entry and expansion in each relevant market. The Big Three bring decades of experience as trusted advisors to marquee clients that could not be replicated in a timely manner by a startup or smaller firm. As WTW's CEO wrote to his Board of Directors in 2018, "[h]igh barriers to entry, existing market share, brand recognition and long-term client relationships give incumbents the edge over newcomers."

68.     Deep "bench strength" in personnel and institutional resources enable the Big Three to retain business even as individual brokers move to other firms. Similarly, the prevalence of post-employment non-compete and non-solicit clauses in the insurance broking industry, including by Aon and WTW, serve as barriers to attracting clients away from the Big Three. The Big Three also have built up significant proprietary data that power these firms' analytics and modeling capabilities—a major selling point with large, complex customers that any new entrant or smaller competitor would lack.

69.     Additionally, for reasons described above, each relevant market contains specific barriers to entry and expansion that will prevent a putative competitor from providing a timely, likely, or sufficient constraint on the merged firm's ability to exercise its increased leverage.

70.     Past attempts have shown that successful entry is difficult. For example, several years ago a number of employees from one of the Big Three attempted to start their own commercial risk broking firm with a focus on serving large customers. Despite having deep experience in the industry and existing relationships with many potential customers, this new venture failed to take much business from Aon, WTW, and Marsh. Similarly, at least one major direct-to-consumer provider spent several years attempting to expand into the private multicarrier retiree exchange market, but has since abandoned that effort due to a lack of success. This direct-to-consumer provider's foray into private multicarrier retiree exchanges was hampered by, among other things, its lack of reputation and experience with large employers that Aon and WTW have handled for years.

71.     For all these reasons, entry and expansion would not be likely, timely, or sufficient to prevent the anticompetitive harm likely to result from the proposed Merger in any of the relevant markets identified above.

72.     The proposed Merger is unlikely to generate verifiable, merger-specific efficiencies sufficient to outweigh the anticompetitive effects that are likely to occur in the relevant markets alleged.

## V.     DEFENDANTS' PROPOSED DIVESTITURES DO NOT ELIMINATE THE MERGER'S ANTICOMPETITIVE EFFECTS

73.     If a merger is likely to substantially lessen competition in any relevant market, the appropriate recourse is to enjoin the entire merger, unless competition can be preserved through a negotiated remedy such as a divestiture. The key to any effective antitrust merger remedy is preserving competition that would otherwise be lost. Any proposed divesture must result in a buyer with both the means and the incentive to compete effectively, ensuring that customers are at least as well off as they were before the merger. Defendants bear the burden of showing that proposed divestitures meet the standard of preserving competition. Defendants here have proposed partial divestitures, but have failed to propose remedies sufficient to preserve competition in all of the relevant markets alleged. Accordingly, the proposed Merger should be enjoined.

74.     In two of the markets at issue—in property, casualty, and financial risk broking for large customers in the United States and in health benefits broking for large customers in the United States—the proposed divestitures would not come close to fully maintaining the competition that would otherwise be lost as a result of the proposed Merger. For example, although Aon has over 100 offices in the United States and WTW has over 80 offices in the United States, Defendants have proposed to divest commercial risk assets in only two offices in the United States (and one office in Bermuda), health benefits assets in only a few offices, and a handful of additional employees who support these offices from other locations. Moreover, the assets to be divested would require carving out individual customer contracts and personnel and

represent only a small fraction of each Defendant's overall business in these markets. With an inadequate divestiture, there is a significant risk that customers would revert to the merged Aon-WTW at the soonest available opportunity—in fact, that is exactly what at least one of the proposed divestiture buyers anticipates will happen.

75.    In the remaining three markets at issue, Defendants have proposed remedies that may preserve competition if reflected in an appropriate consent decree and final judgment of the Court.

76.    The proposed Merger would combine two of the three largest insurance brokers in the world, and two of the three largest competitors in each of the five relevant markets. Each of these markets is responsible for hundreds of millions, if not billions, of dollars in fees paid by American businesses every year, and the Defendants' proposed divestitures leave much of the harm from the proposed Merger unremedied. Because a likelihood of substantial lessening of competition in any relevant market is a violation of Section 7 of the Clayton Act, the Court should enjoin the proposed Merger in its entirety.

## VI.    VIOLATIONS ALLEGED

### Count One

**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18: Property, Casualty, and Financial Risk Broking for Large Customers in the United States**

77.    The proposed Merger, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it likely would lessen competition substantially in interstate trade and commerce in the individual and aggregate markets for property, casualty, and financial risk broking for large customers in the United States for the reasons alleged above.

78.    Unless enjoined, the proposed Merger likely would have the following anticompetitive effects, among others, in the relevant markets:

     (a)    Eliminating head-to-head competition;

     (b)    Reducing competition generally;

     (c)    Causing prices paid by customers to increase; and

     (d)    Causing a decrease in quality, service, and innovation levels.

## Count Two

### Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18: Health Benefits Broking for Large Customers in the United States

79.    The proposed Merger, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it likely would lessen competition substantially in interstate trade and commerce in the market for health benefits broking for large customers in the United States for the reasons alleged above.

80.    Unless enjoined, the proposed Merger likely would have the following anticompetitive effects, among others, in the relevant market:

     (a)    Eliminating head-to-head competition;

     (b)    Reducing competition generally;

     (c)    Causing prices paid by customers to increase; and

     (d)    Causing a decrease in quality, service, and innovation levels.

## Count Three

### Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18: Actuarial Services for Large Single-Employer Defined Benefit Pension Plans in the United States

81.    The proposed Merger, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it likely would lessen competition substantially in interstate trade and commerce in the market for actuarial services for large single-employer defined benefit pension plans in the United States for the reasons alleged above.

82.     Unless enjoined, the proposed Merger likely would have the following anticompetitive effects, among others, in the relevant market:

      (a)   Eliminating head-to-head competition;

      (b)   Reducing competition generally;

      (c)   Causing prices paid by customers to increase; and

      (d)   Causing a decrease in quality, service, and innovation levels.

<u>**Count Four**</u>

**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18: Private Multicarrier Retiree Exchanges in the United States**

83.     The proposed Merger, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it likely would lessen competition substantially in interstate trade and commerce in the market for private multicarrier retiree exchanges in the United States for the reasons alleged above.

84.     Unless enjoined, the proposed Merger likely would have the following anticompetitive effects, among others, in the relevant market:

      (a)   Eliminating head-to-head competition;

      (b)   Reducing competition generally;

      (c)   Causing prices paid by customers to increase; and

      (d)   Causing a decrease in quality, service, and innovation levels.

<u>**Count Five**</u>

**Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18: Reinsurance Broking for Customers in the United States**

85.     The proposed Merger, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because it likely would lessen competition substantially in interstate

trade and commerce in the market for reinsurance broking for customers in the United States for the reasons alleged above.

86.     Unless enjoined, the proposed Merger likely would have the following anticompetitive effects, among others, in the relevant market:

(a)     Eliminating head-to-head competition;

(b)     Reducing competition generally;

(c)     Causing prices paid by customers to increase; and

(d)     Causing a decrease in quality, service, and innovation levels.

## VII.     JURISDICTION AND VENUE

87.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court therefore has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

88.     Aon and WTW are engaged in interstate commerce and in activities substantially affecting interstate commerce. Aon and WTW sell broking services throughout the United States, and their sales have had a substantial effect on interstate commerce.

89.     This Court has personal jurisdiction over each Defendant. Both Aon and WTW are public companies that transact business within this District through, among other things, their sales of broking services.

90.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and under 28 U.S.C. § 1391(b) and (c). Both Defendants transact business in this judicial District.

## VIII.   REQUEST FOR RELIEF

91.   The United States requests that the Court:

(a)   adjudge and decree that Aon's proposed acquisition of the shares of WTW would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)   preliminarily and permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the planned acquisition or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Aon and WTW in the relevant geographic markets alleged above;

(c)   award the United States the costs of this action; and

(d)   award the United States other relief that the Court deems just and proper.

Dated: June 16, 2021

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

  /s/ Richard A. Powers
Richard A. Powers
Acting Assistant Attorney General
Antitrust Division


  /s/ Craig W. Conrath
Craig W. Conrath
Director of Civil Litigation


  /s/ Eric D. Welsh
Eric D. Welsh (D.C. Bar #998612)
Chief
Healthcare and Consumer
Products Section


  /s/ Andrew J. Robinson
Andrew J. Robinson (D.C. Bar #1008003)
Assistant Chief
Healthcare and Consumer
Products Section

      /s/ William H. Jones II
William H. Jones II*
Justin T. Heipp (D.C. Bar #1017304)
Benjamin H. Able
James H. Congdon (D.C. Bar #1019825)
Barry L. Creech (D.C. Bar #421070)
Nathaniel J. Harris (D.C. Bar #1024894)
Jessica N. Leal
Michael T. Nash
Lauren G.S. Riker
Mark Rohan
Patricia L. Sindel (D.C. Bar #997505)
David Stoltzfus
Curtis Strong (D.C. Bar #1005093)
Christopher A. Wetzel (D.C. Bar #1033570)

U.S. Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4100
Washington, DC 20530
Tel.: 202-514-0230
Fax: 202-307-5802
Email: bill.jones2@usdoj.gov

*LEAD ATTORNEY TO BE NOTICED