UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .  CA No. 21-1633  (RBW)
                                .
      v.                        .
                                .
AON PLC, et al.,                .  Washington, D.C.
                                .  Tuesday, July 6, 2021
          Defendants.           .  2:00 p.m.
. . . . . . . . . . . . . . . .  .


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For Plaintiff:              WILLIAM HENDERSON JONES, II, ESQ.
                            U.S. Department of Justice
                            Antitrust Division
                            450 Fifth Street NW
                            Room 4000
                            Washington, DC 20001
                            (202) 514-0230


For Defendant Aon:          DANIEL M. WALL, ESQ.
                            Latham & Watkins LLP
                            505 Montgomery Street
                            Suite 2000
                            San Francisco, CA 94111-6538
                            (415) 391-0600


For Defendant               CLIFFORD H. ARONSON, ESQ.
Willis Towers Watson:       Skadden Arps LLP
                            4 Times Square
                            New York, NY 10036
                            (212) 735-2644


Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001
                            (202) 354-3186

```
 1                          P R O C E E D I N G S

 2                      (Via Telephone Conference)

 3            THE DEPUTY CLERK:  This afternoon we have

 4    United States of America versus Aon plc, et al., Civil Action

 5    21-1633.  I'd ask the parties to identify yourselves for the

 6    record, please.

 7            MR. JONES:  Good afternoon, Your Honor.  My name

 8    is Bill Jones, and I am counsel for the United States in this

 9    matter.

10            THE COURT:  Good afternoon.

11            MR. WALL:  Good afternoon, Your Honor.  This is Dan

12    Wall from Latham & Watkins.  I'm lead counsel for Aon, and I'm

13    on the line with my partners Marc Williamson and Larry Buterman.

14            THE COURT:  Good afternoon.

15            MR. ARONSON:  Good afternoon.  This is Clifford

16    Aronson from Skadden Arps representing Will Towers Watson,

17    and I'm on the line with Karen Lent, also with Skadden Arps.

18            THE COURT:  Good afternoon.

19       If that's everybody, we're here on three motions filed by

20    the defendant, the defendant's motion for entry of a protective

21    order and for production of investigation materials, also the

22    defendant's motion for expedited entry of a scheduling order, and

23    also the defendant's motion to compel responses to the special

24    interrogatories.

25       I guess, really, the first thing we need to address is when
```

realistically we would be able to take this case to trial.
There are some difficulties that I have in scheduling this
matter expeditiously, although I'll do the best I can.

Because of the pandemic, we have not had -- I think we've
only had two trials in the last 15 or 16 months.  Consequently,
we have a huge backlog of old civil case, but more significantly,
a huge backlog of criminal cases where there are constitutional
speedy trial rights involved.

And the events of January 6 we already have, I think, about
500 arrests arising out of that incident.  A number of those
have been assigned to me, and we don't know exactly how many of
those individuals will insist on going to trial.  But, obviously,
if they do, since some of them are incarcerated, their rights to
a speedy trial are going to have to take precedent over other
matters.

So I'll do the best I can to give you a date as quickly
as possible, but it's going to be very difficult because I have
an extremely heavy calendar of trials starting in August, and
I basically will be in trial for the foreseeable future almost
nonstop.

I'll give you the dates that I have, not saying that these
are dates when realistically I can set a trial, but right now
the only dates I have available are August -- actually, I'm
sorry -- September 1 to September 8.  That would amount to five
trial days.  But I have a number of other matters that are

1   scheduled, motions hearings and other matters, so there will

2   be considerable breaks in the trial in order for me to address

3   those matters that are already calendared.

4        November 18 through November 23, that would be four days.

5   Again, I have a number of other matters scheduled, short matters

6   I'd have to deal with; December 20 through December 22, which is

7   only three days; and then January 18 to January 27, which are

8   eight days of trial days.  And then I go on leave for a couple

9   weeks and then would be available again as of February 22.

10       Those are the only dates I currently have available.  And

11  again, I can't assure you that if I set a trial on those dates

12  that the case would necessarily be able to proceed to trial

13  in light of what I indicated earlier, that if there are speedy

14  trial rights I have to respect, that the trial dates that I may

15  set, which I already have some civil cases scheduled on my

16  calendar that may have to be bumped in order to accommodate

17  affording defendants their constitutional speedy trial rights.

18       So with that in mind, I'll entertain any suggestion as to

19  when it would be most appropriate to go to trial.  Obviously,

20  the government objects to going to trial in September, saying

21  they don't have enough time, I guess, to prepare, but I'll

22  entertain argument as to when, based upon what I've indicated,

23  I could possibly set a trial date.

24       And I guess first I should note, how long will the trial

25  last?  I know it's a bench trial, but how long is it anticipated

1    this trial will last?

2            MR. WALL:  Yes, Your Honor.  Thank you.  This is

3    Dan Wall.  I really appreciate the transparency about your

4    schedule.  I think all of us were a little bit concerned that

5    with the events of January, that that might be a problem.

6        So from the merging parties' perspective, this is kind of

7    easy.  We would take the September date and just do the best we

8    can.  It's very short, and everybody would recognize that, but

9    with the urgency that we feel around getting this going and how

10   far the other dates are out into the future, I'm certain I speak

11   for both Aon and Willis Towers Watson that we would take

12   September 1.

13       You know, the timing of these things usually -- when the

14   judge has the flexibility in his or her schedule to allow it,

15   these usually take two to three weeks.  But it sounds to me like

16   we just have to get ready to figure out an alternative in which

17   we can do it in the time that you have allotted.

18       And I think that that may require some ingenuity, and

19   that perhaps we do a few more things by putting in depositions

20   instead of live witnesses or by having written statements

21   instead of some live testimony.  It's been done before, and,

22   under the circumstances, I can commit to you that we would do

23   everything to make it work here.

24            THE COURT:  Anyone else?

25            MR. JONES:  Your Honor, Bill Jones for the

1    United States.  We certainly would prefer the trial date

2    starting in January, on January 18.  We feel there's a lot to be

3    done here during pretrial, as we've noted in our papers, and we

4    feel this case deserves a full record for Your Honor to consider.

5    And going in early September would severely hamper our ability

6    to be able to put together that full record for the Court just

7    in that time that we have remaining between now and September 1,

8    a little under 60 days if I'm doing the math right on the fly

9    here, Your Honor.

10            THE COURT:  Anyone else?

11        Well, government counsel, what would be the impediment

12    that you would experience?  I have looked at your submissions.

13    So what is the most significant impediments you think you would

14    experience in presenting a full record before me if we were to

15    set this matter in September?

16            MR. JONES:  Yes, Your Honor.  Primarily, it would be

17    fact discovery, fact discovery that we would have to conduct

18    on nonparties including data and document discovery, nonparty

19    depositions as well, Your Honor.  Even if we and the defendants

20    are working hard and able to move fast, obviously, requiring

21    data and documents from nonparties who are bystanders to the

22    case, if you will, and pushing them to try to produce materials

23    on very fast timelines is something that could be an impediment

24    to us as we prepare for trial.

25        But also, Your Honor, we would still want and need to

1    conduct fact discovery on the defendants as well, including

2    document and data discovery on them, depositions of their

3    executives.  And once all that's done, Your Honor, we would also

4    need to do expert discovery as well, let the experts conduct

5    analyses of the data that they gather, report that out, and then

6    have time to kind of critique each other, Your Honor.

7         And also I would add that we're dealing with five potential

8    markets here for five counts of the complaint, which compounds

9    matters in terms of trying to prepare for trial on a timeline

10   that has us going in early September.

11        MR. WALL:  Your Honor, this is Dan Wall, if I could

12   respond.  Just to get the last point out of the way, it's not

13   five markets.  With respect to three of the markets, the parties

14   have already agreed in the context of other antitrust reviews

15   around the world to make certain -- to make what we call

16   clean-sweep divestitures in three of these lines.

17        That means that three of the merging parties in one

18   of those lines is being sold off.  It's already in executed

19   contracts that are going to happen.  So that's just not true.

20   There isn't any -- there's no reason to litigate those issues,

21   because we are not acquiring the overlapping assets in those

22   areas.

23        And I would be the first one to say that September's tough,

24   but the difficulty that we're having here is that the reason

25   we're in this predicament is because the Division, for reason

1    sufficient unto itself, decided not to bring this case until

2    the 16th of June, even though we had a timing agreement that

3    contemplated that they would have 90 days from what turned out

4    to be November to review the investigative file and make a

5    decision about what to do.  So they waited for four months.

6    And it's lousy for both of us, to be honest about it.  It puts

7    both of us in a very difficult position.

8        But we're being asked to pay the price for that decision,

9    when it was known to everyone from the beginning of this merger

10    review 15 months ago that we had set this September 9th outside

11    date to get all of these regulatory issues behind us, and it's

12    going to create a great deal of difficulty on these businesses

13    if that gets pushed out.

14        Now, serendipity gives us a chance, because in your very

15    difficult schedule you actually do have the ability to give us

16    September 1, and I just feel that with all the difficulty it

17    is going to create for both of us, it is a miracle that it's

18    available, and we should jump at it and just make this happen.

19        I think we all know that in litigation we tend to overstate

20    what we really need to do, and when deadlines are set, we do

21    what we can do within that and make it work.  That's what I

22    think should happen here, Your Honor.

23            MR. JONES:  Your Honor, if I may, let me --

24            THE COURT:  Identify yourself.

25            MR. JONES:  Oh, my apologies, Your Honor.  Bill Jones

1    for the United States.  Apologies, sir.

2         If I may, Your Honor, this September 9th date has no real

3    meaning here.  It's an agreement between the two merging parties

4    that they can change, Your Honor, if they so choose.

5         And also, Your Honor, nothing special, nothing magical

6    happens on September 9th if the defendants don't act on that

7    day.  Nothing will change.  Nothing will happen to their merger

8    if they don't take any action on that day.  So that day should

9    not handcuff the plaintiff here or the Court or nonparties as

10   we prepare to litigate this case.

11        And also, Your Honor, I should note as well that

12   divestitures have not been agreed to by the United States.

13   We've talked with defendants.  We've gotten mixed signals, to

14   be candid here, as to whether or not they would agree to consent

15   decrees on three of the counts in the complaint, that we discuss

16   in paragraph 75, I believe, of the compliant.  So we're kind of

17   getting mixed signals from them on whether or not they're

18   interested or willing to settle those out through a consent-

19   decree process.

20        But even holding all of that aside, Your Honor, this

21   notion that the government chose to bring this case at some

22   late hour is also taken completely out of context.  Under the

23   timing agreement that defense counsel mentioned, at any moment,

24   starting in January, the defendants could have given the

25   United States notice that they had intended to close their

1    transaction and put us on a ten-day timing trigger if they

2    wanted to make an enforcement decision.  Instead, they did

3    not do that.  They brought forth proposals to the United States

4    to potentially try to address concerns we identified.

5        We took those.  We considered those.  We looked at those.

6    And now defendants are somehow suggesting we should be penalized

7    for doing our due diligence and considering their proposals and

8    attempting to think through the issues that they raised,

9    Your Honor.

10           THE COURT:  Well, let me just say, it would be an

11    extreme exception to the norm to schedule a trial this quickly.

12    The only time I've ever done that before has been in the context

13    of injunctive relief and there were situations where there was

14    an extreme potential harm of prejudice that would occur if the

15    matter was not scheduled as quickly as the parties were -- at

16    least one of parties were requesting.

17        So I guess I need to know what would be the extreme

18    prejudice that the defendants would suffer if this matter

19    did not proceed to trial until January.

20           MR. WALL:  Sure.  So this is Dan Wall again,

21    Your Honor.  Let me just begin by responding very directly

22    to one thing Mr. Jones said which is just incorrect.  The

23    September 9th date has tremendous contractual significance.

24    In fact, when that date passes, my client, Aon, has been

25    substantially prejudiced in its ability to close the deal

1    on the terms that were negotiated 15 months ago.

2        The way this works is that we have until the outside date

3    to close the deal on the terms agreed.  As of the outside date,

4    Willis Towers Watson has a right to terminate the agreement if

5    they wish to and to take a very substantial breakup fee as a

6    result of that.

7        So, from our perspective, to suggest that it's meaningless,

8    that it's just something we can change, no, we can't just change

9    it.  We would have to ask Willis Towers Watson to change it, and

10   they would have to agree; and we don't know what the terms might

11   be that they would have to agree.  So it's highly consequential.

12       But that is actually secondary to the bigger issue here,

13   which is, as you will learn in the course of this case, insurance

14   brokerages is a people business, a human-capital business as

15   they sometimes say, similar to a law firm or accounting firm

16   where there are professionals that work for the company that

17   provide these types of consulting services that we call

18   insurance broking.

19       And it is difficult when you do a merger of any personal

20   services business to keep everyone on board, keep everyone

21   settled down and to deal with the uncertainty, particularly

22   when there's now been a challenge to this and people, all of

23   the employees in these companies, are wondering if it's going

24   to happen; are they going to be part of a merged firm; are they

25   going to be perhaps divested to another firm.  You know, what

1    is going to happen?

2        When we started down this path, Your Honor, 15 months ago,

3    we set out this 18-month period of time and a plan to manage the

4    merger through that period of time, and DOJ was always aware of

5    that.  DOJ was always aware that that was the plan and that's

6    what we were trying to do.

7        And we got it done in every jurisdiction in the world,

8    whether it's either now completed or will be completed by

9    September 9, except the United States of America, except DOJ,

10   which for reasons that I guess they're going to try to put on

11   us, they didn't bring the case at an earlier time when they

12   could have.

13       So that's the problem.  I mean the problem is there's

14   longer delay, there's longer uncertainty for employees, for

15   clients, for shareholders, for lots of people who were involved

16   in this.  It was unnecessary.

17       And we are the ones -- not DOJ.  We are the ones who are

18   going to pick up the tab for this if now this gets kicked off

19   into -- your next available date was November, not January.

20   But if it gets kicked off to November or December or January,

21   that is indeed problematic.

22       One last comment, Your Honor.  This normally would be

23   an action for a preliminary injunction.  But as part of this

24   priming agreement that the DOJ required us to agree to in order

25   to get certain limitations on the amount of information that we

1    had to provide, they required us to agree that they didn't need

2    to file a preliminary injunction motion.  Otherwise, we would

3    do this on a preliminary injunction motion, and the timing that

4    we're talking about, while aggressive, would not be in any sense

5    crazy.

6                MR. JONES:  Your Honor, if I may?

7                THE COURT:  Yes.

8                MR. JONES:  Your Honor, first of all --

9                THE COURT:  For the court reporter again, identify

10   yourself.

11               MR. JONES:  Bill Jones for the United States,

12   Your Honor.  My apologies again.  I will do a better job

13   of identifying myself.

14        Your Honor, if I could start, the United States cannot

15   compel merging parties to enter into a timing agreement.

16   The defendants here are represented by experienced antitrust

17   counsel who has tremendous experience in dealing with the

18   United States in merger matters.  They know what the statute

19   allows them to do.  They know the drill in working on these

20   matters.  So, certainly, the United States can't and didn't

21   force them into some type of timing agreement.

22        But beyond that, Your Honor, they did get benefits from

23   that timing agreement, and what they're now suggesting is,

24   having raked in the benefits from that timing agreement, they

25   are somehow now saying they're burdened by it, but they've taken

1    the benefits already from it.

2         But holding all of that aside, Your Honor, I come back

3    to this outside date, as they call it, really is just an option

4    date.  Nothing has to happen.  The United States had no place at

5    the table when the defendants were negotiating their so-called

6    outside date, not a party to that agreement.  The two defendants

7    are, and they can work together to change that if they so choose.

8         If they truly believe that the benefit of this merger that

9    they claim will be tremendous will actually come true, Your

10   Honor, it seems like pushing out their outside date, as they

11   call it, for a few months would still be worth it in that

12   instance, Your Honor.

13        And also, just finally on this point, Your Honor, I won't

14   belabor it here, but the defendants constructed a merger with

15   two of their -- one of their primary competitors.  That's what's

16   happened here.  So now that they're getting antitrust scrutiny,

17   that should be no surprise to anyone.  When you merge with a

18   company that is one of your primary competitors, you're going to

19   get scrutiny by antitrust authorities, and that's exactly what's

20   happening here, Your Honor.

21        THE COURT:  What's your response to the suggestion

22   that the United States dragged its feet and did not act

23   expeditiously in bringing this matter?

24        MR. JONES:  Your Honor, we absolutely did not.

25   We engaged with the defendants at their request to take into

1    account and look at proposals to cure the competitive problems

2    that we saw.  We took those and looked at those.  We considered

3    multiple ones that have come in to us over a period of time.

4         The alternative here, Your Honor, would have been to not

5    do our due diligence on those proposals to -- to kind of shoot

6    first, if you will, and ask questions later.  But we do not

7    take that approach, and we did not take that approach here.  But

8    somehow the defendants are seeking to penalize us for exercising

9    that due care.

10         THE COURT:  I guess one other question:  I understand

11    the concern about potential prejudice, but isn't it speculative

12    that there would be the harm that's suggested?  I mean, I assume

13    a lot of thought had to go into the decision that a merger would

14    be appropriate and would be a benefit to the merging or proposed

15    merging parties.  I mean, how likely is it that, considering that,

16    that a several-month delay is going to cause one of the parties

17    to walk away from the agreement, which I assume was perceived to

18    be beneficial?

19         MR. WALL:  This is Dan Wall again.  Well, we

20    absolutely thought through that.  We thought through it

21    carefully enough to create an 18-month period for the parties

22    to resolve all regulatory issues.  And as I mentioned earlier,

23    that was sufficient everywhere except the United States.

24         And it would have been sufficient if, in February, when

25    the 90-day, what they call their post-review period, expired,

1    that the DOJ had in this timing agreement, they had -- you know,

2    they had acted.

3         I hate, Your Honor, starting a case with anything that

4    sounds like finger-pointing.  It's not helpful.  I realize that

5    some of the problems they have were outside their control.  The

6    Biden administration has not appointed any political leadership

7    to the Antitrust Division of the Department of Justice.  So it's

8    -- that was a part of the issue, frankly, and that caused

9    issues.  But the government controlled the timing of its suit.

10   Of course it controlled the timing of its suit.

11        Now, as far as can I tell you that there's going to be

12   specific prejudice?  The one thing I know, by the terms of the

13   contract, on September 9th my client, Aon, is at contractual

14   risk.  It doesn't have the same rights that it has under the

15   contract, a $30 billion merger agreement, that it has today and

16   that it will have on September 8th.  And that is tangible.

17        I guess counsel just wants you to dismiss it on the grounds

18   that Willis Towers Watson will dismiss it.  But we don't know

19   that, and it's certainly -- we haven't been told by Willis

20   Towers Watson that they will.

21        And then, you know -- but beyond that, the risk is it just

22   is -- it's more of a "death by a thousand cuts" risk, Your Honor.

23   It's just every passing day, the burdens of this merger on

24   employees and clients and other stakeholders accumulate.

25             THE COURT:  Well, let me add this to the mix.  I would

1    assume, regardless of how I would ultimately rule, that that's

2    not going to be the final decision on this question and that

3    one of the parties who doesn't prevail is going to take this

4    matter, I assume, to the Circuit.  So how does that factor in?

5    Because I assume that, if that occurs, that the merger would

6    not obviously be able to go forward until the Circuit had an

7    opportunity to weigh in.

8             MR. WALL:  Dan Wall again.  So, actually, typically

9    what happens if the defendants prevail, the merger is allowed

10   to close subject to a hold-separate agreement during an appeal.

11   So you can actually close it, but you can't actually start

12   scrambling the eggs.  And then the appeal goes forward.

13        Look, if we lose, we're in a world of hurt, you know?

14   And, yes, at that point, I don't think we're going to be heard

15   to complain very much.

16             MR. JONES:  Your Honor, Bill Jones for the

17   United States.  Your Honor, the defendants had within their

18   power, under this timing agreement we keep discussing, that

19   they could have forced this issue back in January had they

20   been concerned about a lawsuit taking place later in the day.

21   Under the timing agreement with us, they could have forced the

22   issue then.

23        And I would also add, Your Honor, their latest proposal

24   to us that we looked at and thought about was at the end of May.

25   So this notion that we've been kind of sitting around and

1    waiting and letting the grass grow underneath us, Your Honor,

2    that's just not an accurate depiction of how things have played

3    out here.

4        And I would finally add, Your Honor, even with the trial

5    date on an accelerated, superfast schedule that they're

6    proposing and trying to get the September slot, Your Honor, it

7    seems like they would need an actual final decision before this

8    date that they keep harping on, the September 9th date, and all

9    of that is not just compressing time for the discovery and even

10    time for the trial itself, but also the time for a decision to

11    come down on this matter as well.

12        THE COURT:  That was the next point I was going to

13    make.  I would assume, having handled several cases of a similar

14    nature in the past, that these are not easy issues for a judge

15    to resolve, and it's going to take some thought and consideration

16    before I'd be able to make a decision.

17        And, again, because of the calendar, once I -- assuming I

18    accept this matter in September, then I start a fairly complex

19    medical malpractice case right after that.  Then I have to go

20    to Pittsburgh to preside over a multiple robbery case up there

21    for two weeks.  Then I get here and I start two separate trials

22    arising out of the same incident involving alleged bribery claims.

23    Then right after that, then I start another case involving an

24    allegation that a company siphoned off an individual contrary to

25    an anti-compete clause.

1    All of that piles up one after another.  And, again,
2    I've got all these January 6th cases that I'm going to have
3    to schedule at some point, probably in the fall.  I mean I
4    understand the desire to try and get this case to trial as
5    quickly as possible, but I think it's just impractical to,
6    number one, have the parties prepared to present the case to me.

7    Also, it's indicated that normally it would take longer
8    than just five days to resolve this case.  So if we start it
9    and we're not finished and I've got to start this other case,
10   the medical malpractice case, because that case is extremely
11   old and I've promised the parties that I will get this case to
12   trial, because if the allegations being made by the plaintiff
13   are correct, she obviously needs to recover for the damages that
14   were allegedly caused to her.  So I'm not prepared to delay that
15   trial.  So if we weren't finished, that means I would have to
16   continue the trial to a later date to hear additional evidence
17   to completion.

18   I just think, unfortunately, it's not realistic to try and
19   try this case before the January date, and even that's going to
20   be a challenge.  I mean, hopefully, we can get the eight days;
21   but that's only eight days, and I promised my family I would go
22   on vacation because I haven't been able to do that.

23   So I'd have a hiatus of several weeks but -- obviously,
24   I take work with me whenever I go on vacation anyhow, and
25   I would work on the matter while I was away.  But as much as

1    I appreciate the concern to try and get this matter resolved

2    expeditiously, I just don't see how I can accomplish what's

3    being requested with a September trial date.

4         MR. WALL:  So, Your Honor, this is Dan Wall again.

5    The other possibility it seems to me, because this has certainly

6    happened before, is to have -- it would be -- with respect to

7    your calendar, to take the November 18 date and the December 20

8    date to try the case in pieces with a break.

9         I think in terms of the overall dynamics of getting this

10   done and in mitigating the harm from the delay, there's just a

11   world of difference between September versus January and

12   September versus getting the trial started at least in November.

13        So if at all possible, Your Honor, we would ask you to

14   reserve both of those blocks, the November 18 to 23rd block and

15   the December 20 to 22nd block, and allow us to get it done then.

16        THE COURT:  What's the government's position

17   regarding that?

18        MR. JONES:  Your Honor, a couple of things.  First

19   thing is the notion of the November 18th slot indicates to

20   us, as we understand it, that the September 9th date is not an

21   immovable obstacle here if defendants are able and willing to

22   consider a trial starting in November.  So I want to say that

23   first, Your Honor.

24        And then, just in terms of those dates, we think that

25   would obviously be a lot better than the September date.

1      It would still pose challenges, particularly with the big break

2      in between from November 23rd to December 20th.  So we would

3      prefer, actually, still to take the case in January where Your

4      Honor has a bigger block of time to hear the case in one block,

5      potentially.

6            THE COURT:  Why would the break pose a challenge?

7            MR. JONES:  So, Your Honor, it's a matter of witnesses

8      first, Your Honor.  So we're going to have a number of nonparty

9      witnesses that we're going to have to kind of juggle schedules

10      with, potentially.  We're going to have issues where you're

11      going to have a probably highly-publicized, highly-watched trial

12      with nonparty witnesses testifying in the second piece of the

13      trial maybe potentially either hearing what's happened in the

14      first half based on coverage of the trial.  We have that

15      concern, and we just would prefer, based on those logistical

16      issues, to try to get this done at once, if we could.

17           And, Your Honor, I also would just like to say, I don't

18      want us to lose sight here, as we talk about the potential harms

19      to defendants and the downside to them, of this case taking

20      place a little bit later.

21           This is an important merger case for the companies, for

22      their employees, for their retirees.  And so we don't want

23      to lose sight of the potential downside risk of the loss of

24      competition as well.  So we want to make sure we do all we can

25      to get this done and get it done in a way that's a complete

1    record for Your Honor.

2         THE COURT:  Well, you know, obviously, whenever you

3    have any break, what you say is a possibility.  But if you have

4    a day break, I mean that same possibility exists, because if

5    the case is going to be publicized, that publication would

6    occur, I assume, shortly after the testimony of other witnesses

7    was presented.

8         So if what you're talking about was going to occur, it

9    seems to me it was going to occur whether we're talking about

10   a two- or three-week break or a day- or two-break with a couple

11   of witnesses.  So I'm not convinced that that's a sufficient

12   reason not to start the trial in November, with the appreciation

13   that there's going to be a break.

14        And that probably is the better way to go because, as I

15   indicated, I only have eight days in January when I'd be able

16   to preside over the case, and if we don't finish, then we'd have

17   a three-week break while I'm on leave.  So we'd have a break in

18   any event.  This way, if we start in November and then pick up

19   in December, if we aren't finished, then we'd have that time in

20   January when we could finish and hopefully get a decision before

21   I have to leave on vacation.

22        But I think that's probably -- it's unfortunate, but it's

23   the reality of the calendar I'm dealing with, which, as I say,

24   was exacerbated by the pandemic and the inability to try cases

25   during that period, coupled with the events on January 6, which

1    has really just overwhelmed the Court.

2        So I think I will have to deny the request to start the

3    trial in September, but set the trial for the 18th of November,

4    sitting the 18th through the 23rd, those four days during that

5    period when I'd be available, and then pick up on December 20 to

6    the 22nd, and then hopefully we'd be finished.  But if not,

7    we'll have the additional time in January when we could complete

8    the trial and hopefully get a decision as quickly as possible.

9        So with that time table, I think we need to address these

10   issues first regarding the entry of a protective order, and is

11   there no inability for the parties to negotiate this?  Because

12   generally, as you know, these are done by way of agreement

13   between the parties as to what the protective order should

14   entail rather than leaving it to the Court.

15       I mean, I have to do that sometimes, but I think a

16   protective order is most appropriate and probably provides

17   a level of protection the parties want if they're able to

18   negotiate the protective order.  And to the extent that maybe

19   there are particular clauses that can't be negotiated, the Court

20   will have to resolve those, but I would think the better way

21   would be, which is the norm, for the parties to negotiate what

22   should be in the protective order.

23       MR. WALL:  Yes.  Thank you, Your Honor.  Dan Wall

24   again.  So this is unusual in that there's much about this

25   protective order we would love to negotiate, but there's a

1    repeating issue that goes on in merger trials, which is that

2    the protective order is affecting the rights of various third

3    parties who turned over information to the government during

4    its investigation.

5          And so a gating item on the receipt of certain materials

6    is -- the Department of Justice always says that we can't get

7    certain things until they've been able to advise the third

8    parties of the protective order that is in place, potentially

9    give them an opportunity to seek even more protections.

10         Because of that, what we did in this case is we simply

11   accepted the proposal that DOJ made.  The only changes we

12   made were inconsequential nits.  The substance of it, we fully

13   accepted it, and it's not because we love it.  And there's a

14   possibility we may come back to you at some point and ask for

15   some relief around the edges.

16         But we tried to take this issue off the table by simply

17   agreeing to their proposed protective order so that they could

18   immediately begin the process of notifying third parties that

19   they were going to be turning over their information to us; and

20   the DOJ refused to sign their own protective order.

21         They refused to sign it because they said they wouldn't

22   unless it was linked to a whole bunch of other issues that get

23   covered in a case management order, and their argument was the

24   only way to do this is to have a confidence of case management

25   order; nothing can be done one issue at a time.  And that's just

1    not reasonable when the protective order is such a gating item.

2    So that's the only reason why we had to file the motion is

3    because they wouldn't agree to the entry of their own form of

4    protective order.

5        When we did that, we also then asked for the one piece

6    of additional relief, which is just to order them to turn over

7    their investigative file to us as outside counsel immediately.

8    We're 20 days into this case.  We normally, in merger challenges,

9    have already begun to receive the DOJ or the FTC's investigative

10   file.  That's the norm.

11       It's critical, because we're playing catch-up.  They've

12   created that file over a year.  We need to see it and catch

13   up, and we feel that they're just delaying it based upon this

14   protective-order issue.  So if we can just get started because,

15   as we've been discussing, it's going to be a fast schedule, that

16   would help immensely.

17             THE COURT:  Government counsel, do you have a response?

18             MR. JONES:  Your Honor, Bill Jones for the

19   United States.  First, Your Honor, let me make clear, the

20   protective order that the defendant filed, the proposed

21   protective order that they filed and are now asking the Court

22   to enter is not the protective order that the United States

23   sent to the defendants.  The defendants made edits to that.

24       Now, they didn't make many, to be perfectly candid with

25   the Court here.  They did not make many.  Some of them are

1   substantive, though.  And so I would not characterize all

2   of their changes as just nits.  Some of them are substantive.

3        But beyond that issue, Your Honor, our fundamental

4   point here is the material among our investigative materials

5   is not ours.  It belongs to nonparties who produced it to us.

6   We simply think that those nonparties should get notice that

7   a protective order's being entered and a chance to come to

8   the Court to seek additional protections of their material

9   before it goes to the defendants.

10        THE COURT:  Well, have you had an opportunity to

11   discuss with defense counsel the substantive changes you say

12   they've made?

13        MR. JONES:  We have not had those discussions,

14   Your Honor --

15        THE COURT:  Okay.  How much time do you all need

16   to do that?  Because what I'm going to do is I'm going to set

17   a time for you all to complete that.  If you can resolve it,

18   that would be the preference.  If you can't, we'll come back

19   and I'll have to make the determination as to what should be

20   in the protective order based upon the respective positions

21   that you take.

22        MR. JONES:  Yes, sir, Your Honor.  Bill Jones again.

23   If I could ask Your Honor if we could also be directed to meet

24   and confer about the other issues in a case management order and

25   a scheduling order, Your Honor, where we're looking potentially

1    at a very tight discovery timeline with a trial starting in

2    November, even late November.  So it's imperative that we try

3    to wrap up as many of these issues as we can so that we're not

4    coming back to the Court seriatim.

5        And even with that timeline, Your Honor, for discovery on

6    the schedule, the United States would respectfully ask the Court

7    if it would consider, in terms of starting the trial, starting

8    with the December date and then continuing to the January block

9    if necessary, Your Honor.  We would respectfully request that as

10   well.

11       THE COURT:  That issue has been resolved, as I said,

12   when we're going to start, and that's when we're going to start.

13       MR. WALL:  Your Honor, Dan Wall again.  I'm sorry,

14   but we're just getting stalling at this point.  We fixed typos.

15   That's what we did.  We fixed typos, and we had a meet and

16   confer.  They did not tell us of any substantive problems with

17   this order.  This isn't right what's happening here.

18       THE COURT:  Okay.  Well --

19       MR. WALL:  If we need to meet and confer and resolve

20   this, I would ask Your Honor to order us to do it by the close

21   of business today and to send Your Honor an agreed order.

22       MR. JONES:  Your Honor, Bill Jones for the

23   United States.  We have not had a meet and confer, Your Honor.

24   They did more than fix typos, Your Honor.  For example, they

25   stuck a provision in our proposed draft that would allow the

United States to use confidential information produced in this
litigation to enforce any final judgment, any consent decree
that came about as part of this litigation.  That is not a
typo, Your Honor.  That is substantive.

They also altered the definition we had proposed of
confidential information.  We tied our proposed definition to
the definition in Rule 26 of the Federal Rules.  They made an
alteration to that, Your Honor.  That is not a nit.  That is not
a typo, Your Honor.  So there are some substantive changes that
bear discussing, Your Honor, but we certainly are not stalling.

We do think, however, that nonparties should have a chance
to see a protective order, see what's being done to protect
their information, and then come to Your Honor if they don't
believe it is enough since it is their information that we're
talking about.

THE COURT:  Very well.  I'm going to require, then,
that you all meet and confer both regarding the protective order
and regarding the case management order, and that you do that
by Monday the 12th.

And then I'll have you come back, to the extent you can't
resolve issues regarding those two matters and I have to make
the cut, then I'll require that we convene at three o'clock on
the 15th, and I will entertain any disagreements you have
regarding those two matters and trying to make the ruling as
to both at that time.

1          MR. WALL:  Thank you, Your Honor.  Dan Wall.

2     If I could ask, could you please, in the interim, order the

3     United States to begin turning over its investigative file

4     to an outside counsel --

5          THE COURT:  What's your position on that?

6          MR. JONES:  Your Honor, our position is that's

7     tied up with the case management order discussions, and more

8     importantly, it's tied up with the whole issue that we've raised

9     about nonparties having a right to know a protective order is in

10    place and having the right to come to Your Honor to seek

11    additional protections if they so desire.

12         THE COURT:  Is there any way you can bifurcate

13    that information and provide non-third-party investigative

14    information now, and then we can deal with the third-party

15    investigative material when we come back?

16         MR. JONES:  Your Honor, Bill Jones for the

17    United States.  If I may, Your Honor, the vast majority of

18    our investigative material -- the vast, vast majority of that

19    material is actually documents that we received from the

20    defendants during the course of the investigation.

21       Most of this material is stuff that they provided in

22    response to our requests for additional information.  So in

23    terms of the documents at least, Your Honor, they have most

24    of it because it belongs to them.

25         THE COURT:  Well, is there any other information,

1    other than third-party information, that you have in the

2    investigative file that can be produced?

3            MR. JONES:  Your Honor, Bill Jones again.  No, Your

4    Honor.  We believe everything else is third-party information

5    either submitted pursuant to civil investigative demands or

6    pursuant to communications with nonparties.  But everything

7    else in the file that doesn't come from the defendants touches

8    in some way a nonparty of some form.

9            MR. WALL:  Your Honor, this is Dan Wall.  This is

10   actually our point, is this is the file.  This is what we need.

11   This is what we need to get immediately.  And if it's available

12   to us on an outside-counsel-only basis, we will fully abide with

13   their draft protective order.  It doesn't matter.  We just need

14   to get it.  And --

15           THE COURT:  It does --

16           MR. WALL:  -- it is inevitably coming to us.

17           THE COURT:  It does seem to me an agreement could

18   be reached with respect to the protective order so the

19   information can be produced.  But if the parties can't do so

20   as a result of your meet and confer, then I'll resolve it on

21   the 15th.

22       Okay.  So that takes care of the first two motions.  Then

23   the motion to compel responses to special interrogatories, is

24   there a need for us to do that now in light of the trial date

25   that's been scheduled starting in November?

1          MR. WALL:  Yes.  Dan Wall again.  Yes.  My motion,

2     I guess I should probably address it.  Absolutely.  And the

3     reason is, is because that if this release isn't granted, then

4     we're not going to get this for a long time.  We're not going

5     to get it for at least a couple of months through the ordinary

6     course of discovery.  In fact, in my experience, the DOJ often

7     tries to say that we're not entitled to get it unless it's

8     through the expert-discovery process, which puts it at the very

9     end of the case.

10         And yet, what are we talking about here?  We are talking

11    about the most basic building blocks of a merger case, the

12    things that normally are pleaded and that are pleaded very

13    clearly around what defines the relevant market, who the

14    relevant competitors are, what are people's market shares and

15    things like that.

16         Every single one of the questions in these interrogatories

17    that we drafted is basic foundational material that goes into a

18    merger analysis.  It's impossible that the Department of Justice

19    brought this case without having come to at least pretty solid

20    conclusions, if perhaps not their ultimate final answer, on what

21    the answers to these questions are.

22         And given the fact that if, with a November trial date,

23    we're going to have basically until sometime in October

24    to complete the discovery, we have to be able to target that

25    discovery at the DOJ's actual theories which, for whatever

1    reason, they sort of clouded in the allegations that they made

2    in their complaint.

3         Let me just give you one example, but I think it's a key

4    example.  So there's nothing more basic in a merger analysis

5    than the question of the relevant market and who competes with

6    whom, and there are conflicting signals in the complaint as to

7    what DOJ is saying about that.  There is mostly a narrative

8    about a so-called big three of Aon, Willis Towers Watson, and

9    Marsh as being the only firms that appeal to the large customers.

10        But then there is a statement which DOJ actually emphasized

11   in its opposition brief which says that others do compete as

12   well, but they haven't identified who they are.  And so we

13   can't even begin to target discovery around a clear and simple

14   proposition of who DOJ thinks is in the market and who DOJ

15   thinks is not in the market, let alone relate that to market

16   shares and all the other things that we deal with.

17        So it is imperative that we get this information, and there

18   is no good reason not to provide it to us.  There's no social

19   value in hiding the ball over the merger basics that we are

20   talking about here.

21             THE COURT:  Government's response?

22             MR. JONES:  Your Honor, Bill Jones for the

23   United States.  Your Honor, what defendants are asking here

24   is ordinary discovery pursuant to interrogatories that should

25   take place when ordinary discovery takes place.

1      Your Honor, there's nothing unique or special here that

2   mandates them being able to have interrogatories served and

3   have them responded to before discovery even opens.  They've

4   certainly not shown the good cause required by case law to do

5   so.

6      And if their claim here is that the complaint is somehow

7   vague or defective in some way, the Federal Rules provide

8   avenues for them to actually address that.  That they've not

9   chosen to take advantage of those avenues is not on the backs

10  of the plaintiff here, Your Honor.  They could easily, if they

11  had chosen to go this route, filed a 12(b)(6) motion or a 12(e)

12  motion to address what they claim are these problems with the

13  complaint.

14     And, Your Honor, actually, as we look at the complaint, it

15  is not vague.  It is not ill-pleaded.  The complaint follows as

16  many similar complaints that sometimes do not offer the type of

17  information that defendants seem to say should be in any

18  complaint filed by the Department of Justice.

19     And, Your Honor, on top of that, I would say what they're

20  asking certainly falls in some instances right in the heartland

21  of expert discovery that they're trying to get early.  They're

22  trying to get expert discovery at the very beginning of the case.

23     For example, Your Honor, they asked for diversion ratios.

24  I actually have been working in this field for a while.  I still

25  need economists who are experts to help me with concepts like

1    that, but yet they're claiming this is ordinary materials that

2    should be available and part of the complaint, potentially.

3        And finally, Your Honor, I would point out that complaints

4    do not often, if very frequently at all, list every alleged

5    competitor in every market that's alleged in a complaint.

6    That's just not something that happens with the regularity that

7    defense counsel seems to suggest here.

8        THE COURT:  Well, I've ordered that the parties meet

9    and confer regarding the proposed scheduling order, and when you

10    come back to me, I mean hopefully you all would have resolved

11    what that scheduling order should entail.

12        As I said, if you don't, then I'll have to make the call.

13    I will try and do it on that hearing date, but if there are

14    things that you think I need to think about over the weekend,

15    I'll do that.  But I'll have something at the latest, I would

16    hope, assuming the parties can't agree, by the 19th of July.

17    And with that, a part of obviously the scheduling order should

18    be interrogatories.  And if you all again haven't reached an

19    agreement in reference to that, then I will address that.

20        But I won't order that this motion be granted at this

21    time since we're going to expedite trying to get the parties

22    to resolve their differences; and if you can't, then I will.

23    So I'll deny the motion.  But as I said, I'll get you something

24    as quickly as I can so that you can proceed with submitting the

25    interrogatories and having them responded to.

1          MR. WALL:  Your Honor, Dan Wall.  If I may just

2   inquire, I assume you're denying it without prejudice --

3          THE COURT:  Yeah.

4          MR. WALL:  -- in the context of the case management

5   order?

6          THE COURT:  That's correct.

7          MR. WALL:  Okay.  That's fine.  Thank you.

8          THE COURT:  Anything else from plaintiff,

9   government counsel?

10          MR. JONES:  Bill Jones, Your Honor.  Nothing else

11   for the United States at this time.  Thank you, Your Honor.

12          THE COURT:  Anything else from the defense?

13          MR. WALL:  Just thank you for making the time under

14   the circumstances, Your Honor.  Appreciate it very much.

15          THE COURT:  Okay.  We'll do the best we can to get

16   this resolved as quickly as possible.  Again, I just want to

17   note for the record that I hope the dates that we've set will

18   not be in some way negated by these other matters that I have

19   arising out of the January 6th event.

20        As I've said, there's been a number of arrests, a number

21   of those cases have been assigned to me, and I'm going to have

22   to start setting trials.  And I hope I don't have to set trials

23   that will negate the dates that we've set in this case, but that

24   is a possibility, as I said, because of the constitutional

25   speedy trial rights that defendants will have, especially if

1    they are detained.  Thank you.

2                MR. WALL:  Thank you, Your Honor.

3                MR. JONES:  Thank you, sir.

4          (Proceedings adjourned at 3:01 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

          I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter. *


                         */s/ Bryan A. Wayne*
                         Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via teleconference in compliance with
U.S. District Court standing order(s) during the COVID-19
pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion or audiovisual interference.